UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
Annang Ninortey,                    :
                                    :
                                    :    05 Civ. 542 (SHS)(THK)
                   Plaintiff,       :
                                    :         (Pro Se)
      -against-                     :
                                    :    **REPORT AND**
                                    :    **RECOMMENDATION**
C.O. S. Shova; et. al.,             :
                                    :
                   Defendants.      :
                                    :
-----------------------------------X
**TO: Hon. SIDNEY H. STEIN, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

Annang Ninortey ("Plaintiff"), a former prisoner who had been in the custody of the New York State Department of Correctional Services at Green Haven Correctional Facility ("Green Haven"), brings this prisoner's civil rights action pro se, pursuant to 42 U.S.C. § 1983. The case has been referred to this Court for general pretrial supervision and Reports and Recommendations on dispositive motions, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(a) of the Local Civil Rules of the Southern District of New York.

In an Order dated January 8, 2008, the District Court adopted a Report and Recommendation issued by this Court on December 10, 2007, and dismissed the first six claims in Plaintiff's Complaint, as well as all claims asserted against Defendants in their official capacities. Plaintiff's remaining claims allege excessive force and unlawful retaliation against Defendant Correction Officers

1

("CO") S. Shova, CO J. Beers, CO J. Booth, CO K. Truesdell, CO S. Sarles, CO M. Rhynders, CO H. Rosario, CO G. Rayburn; and "deliberate indifference" to Plaintiff's health and safety against Defendants Capt. W. Keyser, Sgt. R. Marinaccio, Dr. Mamis, Nurse Harlan, and Nurse Schott.

Presently before the Court is Defendants' Motion for Summary Judgment, brought pursuant to Federal Rule of Civil Procedure 56, seeking to dismiss Plaintiff's remaining claims. For the reasons set forth below, the Court recommends that Defendants' motion be granted in part and denied in part.

## BACKGROUND

Plaintiff's remaining claims revolve around a June 15, 2004, incident in which Green Haven correction officers used force to restrain Plaintiff. The parties agree that on that date, Defendant CO Beers entered Plaintiff's cell after Plaintiff was called out to report to the Psychiatric Services Unit ("PSU"). CO Beers was conducting a routine pat-frisk of Plaintiff, when an altercation ensued. The parties disagree about what transpired after CO Beers began to conduct the pat-frisk.[1]

---

[1] Plaintiff's version of events, submitted in a set of sworn and signed affidavits in response to Defendants' summary judgment papers, offers a widely different version of events from Defendants' account of the incident. (See generally, Plaintiff's "Statement of Facts in Opposition to Motion for Summary Judgment" ("Pl.'s Opp.").) Defendants' version of events relies on the incident and medical reports from Green Haven's records, rather than affidavits from any of the corrections officers involved. Also, Defendants' Rule 56.1 Statement of Undisputed Material

1.  The First Assault

Plaintiff asserts that after CO Beers entered his cell, he put his genitals on Plaintiff's buttocks, accused him of disrespecting Defendant CO Shova, and then "just started wailing on [him]." (Exhibit ("Ex.") D annexed to Declaration of Julia Lee, dated Feb. 29, 2008 ("Lee Decl."), excerpts of Plaintiff's Deposition, dated June 19, 2007 ("Pl.'s Dep."), at 73.) Plaintiff then claims that CO Beers started to hit him on the right side of his face, and on his back and side, and then started to slam his head into the wall. (See Pl.'s Dep., at 73-74.) When asked if he started bleeding after having his forehead slammed into the wall approximately five times, Plaintiff explained: "No, because like you know, while he was punching, I was like you know, keep my head straight from hitting the wall. And after that, basically they all just jumped on me. Just kicking, hitting the batons." (Id. at 74.)

In an incident report dated June 15, 2004, CO Beers described the incident in this way:

> On [June 15] at approximately 10:10 am, while pat frisking inmate Annang - 02A5690 - to escort him to his psu callout, inmate struck me in the right eye with his right elbow. Officers Booth and Truesdell assisted me in restraining the inmate on the wall. I took control of his right arm by grasping his right

Facts, which Plaintiff does not appear to challenge, and is therefore deemed admitted, see Millus v. D'Angelo, 224 F.3d 137, 138 (2d Cir. 2000), only provides a general outline of relevant events. (See Defendants' Statement of Undisputed Material Facts, submitted pursuant to Local Civil Rule 56.1 ("Defs.' 56.1").

wrist with my right hand. Inmate Annang
continued to struggle. While maintaining
control of the inmates right arm officers
Booth and Truesdell assisted me in putting the
inmate on the floor face down. I then placed
the inmate in mechanical restraints.

(See Ex. B., annexed to Lee Decl., at 221.[2])

Defendant CO Booth, in his report, stated:

[On June 15] at approximately 10:10 am I CO
Booth A Blk #1 witnessed inmate Annang elbow
CO J. Beers with his right elbow to CO J.
Beers right eye. I responded by restraining
the inmates left arm by placing my right hand
[on] the inmates left hand and my left hand on
the inmates left forearm[.] [T]he inmate
continued to struggle while keeping control of
the inmates left arm and with assistance from
CO J. Beers and CO K. Truesdell we put the
inmate on the floor face down[.] I then
brought the inmates left arm to the center of
his back. Mechanical restraints were then
applied by CO J. Beers.

(Id. at 220.)

Defendant CO Truesdell's report indicates that he also
witnessed Plaintiff strike CO Beers. His report states:

I responded [by] placing my left knee in the
back of [Plaintiff's] left leg [and] grasping
his right leg with [my left and right] hand[s]
in an attempt [to] restrain inmate on the
wall. [Plaintiff] continued to resist, while
maintaining control of his right leg with my
right hand and left hand, I placed my weight
on the back of [Plaintiff's] left leg and with
the assistance of CO Beers and CO Booth we put
the inmate on the floor face down. I then

---

[2] Page numbers occasionally appear on the bottom right
corner of Defendants' documents and appear to be identifying
numbers added during discovery. All exhibits referenced herein
are annexed to Lee's Declaration, unless otherwise indicated.

> placed the inmate in a figure four leg lock in
> an attempt to restrain him[.] [H]e continued
> to resist. CO Beers placed mechanical
> restraints on [Plaintiff].

(<u>Id.</u> at 219.)

An "inter-departmental communication" prepared by Defendant Sgt. Marinaccio, repeated the officers' account of their use of force. (<u>See</u> <u>id.</u>, at 216-17.)

Plaintiff contends that after his head was slammed into the wall, "[he] basically just fell to the ground and they started using their batons and their feet and their knees and, you know, [CO] Booth took [him] – Booth took [his] left ankle and twisted it up really bad . . . ." (Pl.'s Dep., at 75.) He goes on to claim that CO Shova then joined in and started hitting him with her baton, and that he tried to curl up in a ball "so [he] wouldn't get hurt that badly." (<u>Id.</u>)

As Plaintiff notes about the documentary evidence: "officer Shova is not even mentioned in the incident [reports] as if she was never there." (Pl.'s Opp., at 2 ¶ 8.) However, he claims that: "If you look on the sign in sheet for officers working that day you would notice that officer Shova did sign the log book in statement that she was on the block . . . ."[3] (<u>Id.</u>) Plaintiff alleges that

---

[3] Plaintiff is correct. A log book entry attached to his opposition papers indicates that CO Shova was on his block at the time of the incident. (<u>See</u> Pl.'s Opp., at page stamped 42.) Plaintiff is also correct that there is no other evidence that CO Shova had any contact with Plaintiff, or was involved in any way in the incident.

"Officer Shova participated by hitting plaintiff several times in the head with her batton (sic), while officers Booth, Beers and Treusdell punched and kicked and twisted plaintiffs ankles and wrist." (Id.) There are no reports by CO Shova in the record, other than the investigation of Plaintiff's prior complaint.

Plaintiff filed a grievance against CO Shova in the week prior to the incident, alleging that CO Shova denied Plaintiff breakfast on one occasion. (See Pl.'s Opp., at 236, Grievance by Plaintiff against CO Shova for refusing Plaintiff breakfast, dated June 4, 2004.) The Grievance was investigated, and, on September 2, 2004, denied.[4] (See id. at 233-35.)

None of the officers involved in this incident have submitted an affidavit or other sworn statement confirming the version of events set forth in their reports. The incident reports are signed by the officers, but do not indicate that they were sworn to under penalty of perjury. CO Shova has not filed an affidavit denying Plaintiff's claims.

2.  The Second Assault

Plaintiff goes on to describe a second series of events immediately following his being put in restraints in his cell, and while being escorted to the Special Housing Unit ("SHU"). Plaintiff alleges that "[a]fter [P]laintiff was assaulted by

---

[4] Plaintiff's sixth claim in his Complaint in this action was based on the same allegation in his grievance, and was dismissed by the Court in an Order dated January 8, 2008.

6

correctional officers Beers, Booth, Truesdell, and Shova, Plaintiff was then escorted to the facility shu by correctional officers Rhynders, Rayburn, Rosario, and Sarles who continued to ass[a]ult [P]laintiff even though he was already in restraints, and [posed] no threat to these officials." (Pl.'s Opp., at 1 ¶ 3.) Plaintiff continues: "Most of these actions wa in the elevator leading to the facility shu, and if the cameras in the elevator are in working condition, it would show that what plaintiff claims is truth." (Id.)[5]

What Plaintiff claims is that after his hands were restrained, Defendants CO Rhynders, CO Rosario, CO Rayburn, and CO Sarles put a restraint around his neck and he "was basically dragged out of the block and while they are dragging [him], they are hitting [him]." (Pl.'s Dep., at 81-82.) While Plaintiff was being taken to the elevator, he alleges that CO Rhynders "had [him] by [his] neck with the restraints on and Rosario had [his] arms like [Rosario] was trying to - [he's] cuffed up and [Rosario] kept lifting [Plaintiff's arms] up." (Id. at 83.) Plaintiff describes the incident in the elevator as a fifteen-minute assault:

> "That's like when we got into the elevator, that's when they held my legs. When we got into the elevator with the restraints [tied] around my neck, they were choking me. They was choking me. I lost consciousness a couple of times. I would regain consciousness and I would get choked again. That happened all the

---

[5] Apparently, no videos have been produced in this case.

7

way up to for like, maybe, 15 minutes and then
finally the elevator doors opened.  The first
wave of assault took about 15 minutes."

(Id. at 83-84.)

During this alleged assault, Plaintiff contends that Captain
Keyser and Sergeant Marinaccio ("Sgt. Marinaccio") stood by
watching, without giving an order to stop the officers from
assaulting him.  (See id. at 84; Pl.'s Opp., at 3 ¶ 3.) There are
no affidavits, but CO Rhynders, CO Rosario, CO Rayburn, each wrote
very brief reports to Sgt. Marinaccio indicating that they took
Plaintiff to the SHU without incident.[6]  (See Ex. B, at 224-26.)
CO Rhynders's report indicates that Sgt. Marinaccio was on the
scene at the time that Plaintiff was taken to the SHU.  (See Ex. B,
at 225, "Per your direction . . . .")  Sgt. Marinaccio also
conducted an investigation of the incident, and wrote a report
repeating each officer's account of what happened.  (See Ex. B, at
216-17.)

Captain Keyser ("Keyser") did submit an affidavit stating he
was not a witness to the incident or involved in any manner.  (See
Affidavit of William Keyser, dated Feb. 26, 2008 ("Keyser Aff."),
¶ 9.)  In support of his assertion, Keyser notes that he conducted
the disciplinary hearing arising out of the first alleged assault,
in which Plaintiff allegedly elbowed CO Beers in the eye.  (See

---

[6] Plaintiff alleges that CO Sarles was involved in the
second assault.  (See Pl.'s Dep., at 81.) There are no reports
written by CO Sarles or any reports that mention him.

id., ¶ 8.)  Keyser argues that he could not have been a witness to
an incident, and also preside over a disciplinary hearing arising
out of the same incident, citing to New York Compilation of Codes,
Rules, and Regulations Title 7, § 254.1.  (See id.)  The regulation
states that "a person who actually witnessed the incident; a person
who was directly involved in the incident; the review officer who
reviewed the misbehavior report, or a person who has investigated
the incident" shall not conduct the disciplinary hearing.   N.Y.
Comp. Codes R. & Regs. tit. 7, § 254.1.

3.   The Pictures

Plaintiff was eventually seen by medical staff.  He explains:
"[they] ordered [me] to take a seat in front of Nurse [Schott] and
she basically turned her papers around and said sign this.  I was
trying to read what it is. I was signing but the sergeant barked at
me, sign that or you are going to get beat up all over again.
Basically I signed.  And after that, that's when they took these
pictures, you know."  (Pl.'s Dep., at 98.)

Pictures were taken of Plaintiff that day, which do not appear
to show any injuries.  (See Ex. E.) Plaintiff explains the pictures
by contending: "If you take a look at the pictures submitted by
prison officials in this case you would notice, prison officials
only took pictures of plaintiff from a far distance, in this case
you can not really view plaintiff[']s injuries.  No pictures were
taken of plaintiff[']s wrist, neck . . . no pictures were taken of

ankles or the sides of plaintiff[']s face." (Pl.'s Opp., ¶ 5.)

Pictures were also taken of the officers, which show an officer with a swollen eye, two pictures of knees, both showing some redness, and a picture of an officer holding up his hand.[7] (See Ex. E.) Despite this, Plaintiff asserts: "No punches were thrown by plaintiff at any time during his ass[a]ult by prison officials[.] [O]fficer Beers claims plaintiff elbowed him in the eye while he was performing a pat frisk on plaintiff but the photograph of officer Beers['s] eye shows no redness swelling or bleeding. Officer Booth claims he injured his hand, that may hold some truth due to the fact that he was using his hands to punch plaintiff. [CO Truesdell] claims he injured his knee, but still his knee show (sic) no injury or redness[.] [T]hese are white men." (See Pl.'s Opp., at 2 ¶ 7.)

4. Medical Care

Plaintiff claims that after the alleged assault, he was denied medical treatment while he was in the SHU: "Basically I asked for medical attention because I was denied it after I was assaulted. I asked for Motrins, you know, stop the pain and to be allowed the chance to go in to the infirmary and have it checked out and they weren't doing any of those things." (Pl.'s Dep., at 102.) He

---

[7] The photographs do not identify the officers pictured. However, Assistant Attorney General Julia Lee states that they show CO Beers, CO Booth, and CO Truesdell. (See Lee Decl. ¶ 2(E).)

claims that "[he] was all bruised up. Cuts on [his] wrist. Cuts. [His] ankle was twisted so bad, [he] couldn't even stand on it." (Id.) Plaintiff further alleges that his "shoulders hurt really bad, from pulling [his] arm up and down," that his "mouth was all bloody," and that he "had a couple of scrapes and bruises on [his] knees that was a little bloody." (Pl.'s Dep., at 102-03.) Finally, Plaintiff claims that his teeth "were all cracked [on] the right side of [his] jaw." (Pl.'s Opp., at 1 ¶ 5.)

Defendant Nurse Schott[8] admitted Plaintiff to the SHU and examined him. (See Ex. B., Use of Force Report.) Her report notes no visible injuries and that no treatment was given. (See id.) On June 15, the day of the incident, Plaintiff was observed "ambulatory around cell." (See Ex. C, Plaintiff's Ambulatory Health Record ("Health Record"), entry dated 6/15/04, 8:00 p.m.) The next day, Plaintiff complained of neck pain, lower back pain, ankle pain, and of bumps on his forehead. (See id., entry by Harlan, dated 6/16/04 at 5:30 p.m.) He claims that another nurse, Nurse Harlan, placed a few Motrins on the cell bars and then "yelled at [him] to get up and get them and [he] told her [he] couldn't stand on [his] feet and she kept screaming, get up, get up, get up and then since [he] couldn't get up, she took the Motrins off the bar." (Pl.'s Dep., at 103.) Defendant Nurse Harlan states that: "On June 16, 2004 I attempted to examine plaintiff

_____

[8] Schott uses her married name, Mryzglod, in the reports.

while he was housed in the [SHU]. Plaintiff complained of right neck and right ankle pain and 'bumps' on his forehead. However, when I attempted to examine him, plaintiff became uncooperative and refused to show me his neck or ankle. I asked numerous times for plaintiff to be cooperative but he refused. Plaintiff had no notable injuries, marks, bruises or redness . . . ." (Affidavit of Suzanne Harlan, dated Feb. 25, 2008 ("Harlan Aff."), ¶ 3; <u>see also</u>, Health Record, entry by Harlan, dated 6/16/04 at 5:30 p.m. (noting same).)

Plaintiff was seen daily by medical staff. On June 17, 2004, he complained of "pain all over," but an exam "revealed no injury" (<u>See</u> Health Record, entry dated 6/17/08.) On June 18, 2004, his record notes that he "appear[ed] comfortable, seated on bed, writing." (<u>See</u> <u>id.</u>, entry dated 6/18/08.) Defendant Dr. Mamis, a licensed physician employed by the Department of Correctional Services, reviewed Plaintiff's medical records, which he notes "reveal no injuries." (<u>See</u> Affidavit of Dr. Harry Mamis, dated Feb. 25 2008 ("Mamis Aff."), ¶ 6.) Dr. Mamis also notes, and the Health Record confirms, "after the use of force incident, plaintiff was seen by a member of the medical staff daily from his admission on June 15, 2004 until his suicide attempt on June 19, 2004." (<u>See</u> Mamis Aff. ¶ 7; <u>see also</u> Health Record, entries dated June 15 to June 19, 2004.)

On the morning of June 19, 2004, a brief disciplinary hearing

12

was held by Captain Keyser, which Plaintiff refused to attend. (See Ex. B annexed to Keyser Aff., transcript of disciplinary proceeding ("Disc. Tr."), at 2.) It was adjourned so that Keyser could obtain more information. The hearing resumed on July 2, 2004, at which time Plaintiff was found, in absentia, not guilty of creating a disturbance and refusing a search and frisk procedure, but guilty of assault on staff. (See Disc. Tr., at 4.) As a penalty, Plaintiff was given "180 days SHU, commissary and packages and phone calls." (Id.)

5. Attempted Suicide

In the afternoon of June 19, 2004, after he was informed of the disciplinary hearing, Plaintiff attempted suicide by trying to hang himself with a T-shirt. (See Health Record, entry dated 6/19/08.) He was discovered, briefly transferred to Putnam Hospital Center ("Putnam"), and then moved back to the psychiatric unit at Green Haven. (See id.; Pl.'s Dep., at 106.)

While at Putnam Hospital, Plaintiff met with a crisis counselor and discussed his family history, health, and life as an inmate. The report does not make any mention of an assault by corrections officers, and only mentions two injuries, pre-existing problems with his back and teeth. (See Ex. C, Putnam Hospital Center Report ("Putnam Report").)

This was not the first time that Plaintiff had attempted suicide. A medical report, dated March 2, 2004, notes that he was

13

last on suicide watch on February 18, 2004, and that he had made suicide attempts in the past. (See Ex. C., Examination Report dated Mar. 2, 2004.) That report also notes, and Plaintiff admits, that he has been diagnosed with, and was being treated for paranoid schizophrenia. (See id.; see also Pl.'s Dep., at 19.) Plaintiff alleges that he attempted suicide on June 19, 2004, because of the June 15 assault. (See Plaintiff's Second Amended Complaint ("Compl."), at 14-15.) [9]

6. The Medical Expert

In response to Plaintiff's claims that he was brutally assaulted, Defendants have submitted an affidavit by Dr. Diane Sixsmith. (See Affidavit of Diane Sixsmith, dated Feb. 21, 2008 ("Sixsmith Aff.").) Dr. Sixsmith is a highly qualified and experienced doctor, who is currently the Chairman of the Department of Emergency Medicine at the New York Hospital Medical Center of Queens. (See id. ¶ 2.) According to her expert report, she has been an emergency physician for thirty-one years, and has treated thousands of patients injured by assaults, fights, motor vehicle accidents, and falls. (See Ex. A, annexed to Sixsmith Aff., letter

---

[9] The 23-page handwritten Second Amended Complaint (not including attachments) does not contain page or paragraph numbers. For the purposes of this Report and Recommendation, the first page of the Complaint, containing the caption, is considered to be page 1. Page 7 is the first page of the narrative part of the Complaint and begins with "Facts:."

14

to Mr. Shevlin, dated Aug. 7, 2007 ("Expert Report"), and Curriculum Vitae of Dr. Sixsmith.)

Dr. Sixsmith did not examine Plaintiff personally, but reviewed documentary evidence, including the Health Records, photographs, and Plaintiff's deposition. (See Sixsmith Aff. ¶ 1; Expert Report.) She opines that if events occurred as Plaintiff described, "plaintiff would have suffered obvious bruising, swelling, bleeding, especially about the face and head. It would have likely resulted in fractured ribs, blood in the urine, internal bleeding, head injury, and tracheal damage. . . ." (Sixsmith Aff. ¶ 3.) She concludes, based on the absence of objective evidence of injury: "that Mr. Annang's account of the incident of 6.15.04 is not credible and that he sustained no significant injury." (Expert Report.)

Plaintiff challenges Dr. Sixsmith's conclusions by noting "[o]ne can not judge injuries by looking at a picture." (Pl.'s Opp., at 9 ¶ 1.)

## DISCUSSION

Defendants seek summary judgment and argue: 1) Plaintiff's claims are frivolous and should be dismissed pursuant to 28 U.S.C. § 1915; 2) the medical personnel defendants were not deliberately indifferent to Plaintiff's medical needs; 3) the medical personnel are entitled to qualified immunity; 4) Plaintiff's retaliation claims are without merit; 5) the claims against Captain Keyser

15

should be dismissed for lack of personal involvement. Plaintiff asserts his claims are true and that the incident reports and medical records were fabricated.[10]

## I. Dismissal Pursuant to 28 U.S.C. § 1915

Plaintiff was granted in forma pauperis status pursuant to 28 U.S.C. § 1915. That statute allows an indigent litigant to commence and pursue a civil action in federal court without paying certain costs. See 28 U.S.C. § 1915(a). The statute also allows a district court to dismiss a case if the court determines that the action is "frivolous or malicious," to protect against abuses of this privilege. See 28 U.S.C. § 1915(e)(2)(B)(i).

The Supreme Court has held, in the context of a motion to dismiss a claim pursuant to § 1915, that "a court may dismiss a claim as factually frivolous only if the facts alleged are 'clearly baseless,' 'fanciful,' 'fantastic,' and 'delusional.'" Denton v. Hernandez, 504 U.S. 25, 32-33, 112 S. Ct. 1728, 1733 - 1734 (1992) (quoting Neitzke v. Williams, 490 U.S. 319, 325-328, 109 S. Ct. 1827, 1831-33 (1989)) (internal citations omitted). However, "to dismiss [a complaint] as frivolous without any factual development is to disregard the age-old insight that many allegations might be 'strange, but true; for truth is always strange, [s]tranger than

_____

[10] Specifically, Plaintiff argues: "This whole case is made off of lies by prison officials at Green Haven Correctional facility after attempting to make matters seem as if plaintiff is delusional and is fabricating his 2nd amended complaint . . . ." (Pl.'s Opp., at 5 ¶ 12.)

fiction.'" Denton, 504 U.S. at 33, 112 S. Ct. 1734. Thus, a court may not dismiss a complaint "simply because the court finds the plaintiff's allegations unlikely." Id. Nonetheless, a court may, in its discretion, determine a case is factually frivolous "when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." Id.

Dismissal pursuant to § 1915 is not appropriate in this case. Section 1915 is typically invoked at a much earlier stage in the proceedings, when, without any factual development, courts review a complaint to determine if it lacks any basis in law or fact. See Preston v. New York, 223 F. Supp. 2d 452, 462 (S.D.N.Y. 2002) (describing dismissal pursuant to § 1915). The record in this case, which is fairly complete, and material portions of which are disputed, does not suggest that dismissal pursuant to § 1915 is warranted.

Notwithstanding Plaintiff's diagnosed mental illness, Plaintiff's claims are not facially irrational or frivolous in light of three correction officers having admitted to using some force against Plaintiff. Although Plaintiff has made allegations which, in light of his medical records appear to be greatly exaggerated, Plaintiff's claims have a factual basis, and thus, the Court cannot conclude that they are entirely fanciful or the product of delusion.

17

By contrast, other cases in which the plaintiffs' claims were dismissed as factually frivolous pursuant to § 1915, involved accusations far more irrational, wholly incredible, or plaintiffs who were clearly delusional. See, e.g., McCracken v. Fass, No. 06 Civ. 3892 (JS) (ARL), 2006 WL 2927162 (E.D.N.Y. Oct. 10, 2006) (dismissing complaint against the President and various other governmental officials and entities alleging that they forced the plaintiff's wife and daughter into committing criminal acts); Mecca v. The United States Gov't, No. 06 Civ. 3492 (JS) (WDW), 2006 WL 2927157 (E.D.N.Y. Oct. 4, 2006) (dismissing complaint against "The United States Government and all its entities Federal, State, Local and including all direct and indirect government liaisons" as being "replete with fantastic and delusional scenarios"), aff'd, Mecca v. The United States Government, Nos. 06-5305-cv, 07-2621-op, 232 Fed. Appx. 66 (2d Cir. Aug. 17, 2007) (unpublished); Sumay v. City of New York Health and Hospital Corp., No. 97 Civ. 3606 (SS), 1998 WL 205345 (S.D.N.Y. Apr. 28, 1998) (dismissing claims that the plaintiff was being subjected to a detrimental "electronic medium," the air fed into plaintiff's room was being manipulated via the sprinkler system, that he was being deliberately subjected to "percussive noises," and that plaintiff was being fed tainted food); Manzo v. Manzo, No. 95 Civ. 4286, 1995 WL 837317 (E.D.N.Y. Mar. 18, 1995) (dismissing complaint alleging that the plaintiff

was sold to the CIA by his family and was controlled by a group called the RING, for entertainment purposes).[11]

Accordingly, the Court recommends that the Complaint not be dismissed pursuant to 28 U.S.C. § 1915.

## II. Summary Judgment Standards

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless a court determines that there is no genuine issue of material fact to be tried, and that the moving party is entitled, as a matter of law, to summary judgment in its favor. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 98 (2d Cir. 2003). The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Once a properly supported motion for summary judgment has been submitted, the burden shifts to the non-moving party to make

---

[11] Defendants' reliance on Gashi v. County of Westchester, No. 02 Civ. 6934 (GBD), 2007 WL 749684 (S.D.N.Y. Mar. 12, 2007), in this context, is inapposite. In that case, the district court reviewed the merits of the plaintiff's claims and found that they did not meet the legal standards necessary for a plaintiff to prevail on a use-of-force claim. See id., *6 -7. The court never cited to, or relied upon, § 1915, and the plaintiff's suit was not dismissed pursuant to that statute. Nor did the court in Gashi find that the plaintiff's claims were delusional or fanciful. See id.

a sufficient showing to establish the essential elements of the claims on which it bears the burden of proof at trial. See Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003); Peck v. Pub. Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553).

In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006). However, the non-moving party must put forth "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial. See Anderson, 477 U.S. at 256-57, 106 S. Ct. at 2514; Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007). However, if a plaintiff is proceeding pro se, courts are to construe the pleadings liberally. See, e.g., Williams v. Edwards, 195 F.3d 95, 96 (2d Cir. 1999).

20

III. <u>Excessive Use of Force/Retaliation</u>

Plaintiff has alleged that the defendant officers used excessive force against him, viciously and maliciously, in violation of his Eighth Amendment right to be free from cruel or unusual punishment. Plaintiff alleges Defendants assaulted him because he made complaints about CO Shova, and, therefore, violated his First Amendment right to be free from retaliation.

Defendants argue that, notwithstanding the unlikely nature of Plaintiff's claims, the officers used necessary but minimal force to restrain him, and that there is no evidence to support Plaintiff's claims that he was severely injured, or that any use of force was motivated by any complaints Plaintiff may have filed. The Court concludes that there are genuine issues of material fact as to whether the officers used excessive force against Plaintiff.

A. <u>Excessive Force</u>

"The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Scott v. Coughlin</u>, 344 F.3d 282, 291 (2d Cir. 2003) (citing <u>Hudson v. McMillian</u>, 503 U.S. 1, 7, 112 S. Ct. 995, 999 (1992)). Excessive force claims have two components. The first is a subjective component, "focusing on the defendant's motive for his conduct," and whether the defendant "had the necessary level of culpability,

21

shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." <u>Sims v. Artuz</u>, 230 F.3d 14, 21 (2d Cir. 2000) (citing <u>Hudson</u>). The factors courts examine include: "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." <u>Scott</u>, 344 F.3d at 291 (quoting <u>Romano v. Howarth</u>, 998 F.2d 101, 105 (2d Cir. 1993)).

The objective component focuses on the conduct's effect, and is "responsive to 'contemporary standards of decency.'" <u>Hudson</u>, 503 U.S. at 8, 112 S. Ct. at 1000. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." <u>Hudson</u>, 503 U.S. at 8-9, 112 S. Ct. at 1000. As part of this inquiry, a complaining prisoner is not required to show that he suffered serious or permanent injury, but the extent of the prisoner's injury is relevant to a determination of whether force was "sufficiently serious by objective standards." <u>Griffin v. Crippen</u>, 193 F.3d 89, 91 (2d Cir. 1999); <u>see also</u> <u>Sidney v. Wilson</u>, No. 03 Civ. 0830 (HBP), 2007 WL 4208626, *4 (S.D.N.Y. Nov. 21, 2007) (noting same). It is well established that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights . . . Indeed, not even

'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (quoting Hudson, 503 U.S. at 9, 112 S. Ct. at 1000); see also Jeanty v. County of Orange, 379 F. Supp. 2d 533, 540 (S.D.N.Y. 2005) (noting same). Rather, the alleged conduct must involve the "unnecessary and wanton infliction of pain." Sims, 230 F.3d at 21 (quoting Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994) (quoting Hudson, 503 U.S. at 8, 112 S. Ct. 995)).

Plaintiff has alleged that CO Beers and three other officers, including CO Shova, viciously assaulted him because of complaints he made against CO Shova. Plaintiff also contends that he never threatened or attacked the officers, and that they used force against him without good reason, punching and kicking him, and slamming his head into the wall. In response, Defendants offer only their unsworn reports, which indicate that during a pat frisk, Plaintiff hit officer CO Beers in the eye with his elbow. Defendants argue that they used only the force necessary to subdue Plaintiff by bringing him to the floor. The reports do not, however, provide any detail as to the force used; rather, they merely describe the techniques the officers employed to bring Plaintiff to the floor face down.

Furthermore, the allegation that Plaintiff elbowed an officer in the eye, even if true, does not mean that, as a matter of law, Defendants are entitled to summary judgment. See Brewer v. Jones,

No. 02 Civ. 3570 (NRB), 2003 WL 22126718, at *4 (S.D.N.Y. Sept. 12, 2003) (noting that "an admitted assault by a prisoner on a prison guard does not in and of itself 'preclude a reasonable jury from finding that excessive force was used against him [by the guard] on the day in question' and that 'the fact that [the prisoner] suffered only minor injuries does not warrant dismissal.'") (quoting Griffen, 193 F.3d 89 at 92). Plaintiff denies that he elbowed CO Beers in the eye, and also asserts that CO Beers's actual motivation for the use of force was retaliation for Plaintiff's complaints against CO Shova. These contrasting positions create a genuine dispute regarding Defendants' motives for their conduct.

In light of Plaintiff's sworn statements describing a brutal assault by the Defendant correction officers, the absence of any affidavits contradicting Plaintiff's version of events, and the incident reports describing Defendants' use of force, a genuine issue of material fact exists as to the wantonness of the officers' actions, the need for the application of force, the amount of force used, and the efforts made by Defendants to temper their response.

The same reasoning holds true for the alleged second assault. Defendants CO Rhynders, CO Rayburn, CO Rosario, and CO Sarles only offer unsworn reports indicating that they escorted Plaintiff to the SHU without incident, while Plaintiff has submitted an affidavit asserting that they assaulted him, beat him, and choked

him to point of unconsciousness in the elevator on the way to the SHU. As such, there are genuine issues of material fact as to whether the second assault occurred and whether the Defendant officers used unnecessary, excessive force.

Plaintiff also alleges that, as a result of the two assaults, he suffered serious harm and was in significant pain. Defendants, pointing to the medical evidence, argue that there is no reason to believe Plaintiff's account, or that he suffered any harm whatsoever. However, Plaintiff's sworn statements are "more than mere conclusory allegations subject to disregard . . . [T]hey are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion." Scott, 344 F.3d at 289 (citing Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)).

Nonetheless, in light of the absence of any objective medical evidence showing Plaintiff suffered physical injury, whether Plaintiff can demonstrate harm under the objective component of Eighth Amendment analysis is a closer question. See Warren v. Westchester County Jail, 106 F. Supp. 2d 559, 569 (S.D.N.Y. 2000) (granting summary judgment, noting that an extremely slight degree of injury "weighs heavily towards the conclusion that the degree of force was de minimis" and therefore not violative of the Constitution).

Defendants' expert claims Plaintiff's alleged injuries are inconsistent with the force he alleges the officers used against him. The Expert Report does not, however, conclude that Plaintiff suffered no harm at all, but rather that his claims are "not credible and that he sustained no _significant_ injury." (Expert Report (emphasis added).)

First, Dr. Sixsmith's opinion about Plaintiff's credibility is not competent evidence. The law is clear that the credibility of a party's statements, and the weight of contradictory evidence, may only be evaluated by a finder of fact. See Scott, 344 F.3d at 290 (reversing the district court's grant of summary judgment to the defendants because the court "made an impermissible credibility determination and weighed contradictory proof") (citing Vital v. Interfaith Med. Ctr., 168 F.3d 615, 621-22 (2d Cir. 1999)). Furthermore, Plaintiff is not required to show he sustained a _significant_ injury. See Griffin, 193 F.3d at 91. Therefore, the Expert Report does not provide sufficient grounds for an award of summary judgment.

Nonetheless, as the expert concluded, Plaintiff's claimed injuries are not supported by the medical records or the photographs. The pictures of Plaintiff, taken as part of the use-of-force report, show no obvious injury or blood, and the notes in Plaintiff's medical records indicate no signs of injury. As Plaintiff notes however, the photographs are grainy and taken from

a distance, and the medical records only show that a visual inspection was made of Plaintiff from outside his cell. They clearly note, however, that he complained of pain consistent with his allegations of the force used against him.

Courts in this district have not required that injuries caused by the alleged use of excessive force be corroborated by medical records. See Lunney v. Brureton, No. 04 Civ. 2438 (LAK) (GWG), 2007 WL 1544629, *13 (S.D.N.Y. May 29, 2007) (noting "cases have frequently denied summary judgment for excessive-force violations while noting the absence of corroborating medical records") (citing Atkins v. County of Orange, 372 F. Supp. 2d 377, 399 (S.D.N.Y. 2005); Davis v. Patrick, No. 92 Civ.0548 (BSJ), 2000 WL 1154065, at *1 (S.D.N.Y. Aug. 14, 2000); Baskerville v. Goord, No. 97 Civ. 6413 (BSJ), 2000 WL 897153, at *1-2 (S.D.N.Y. July 6, 2000)); see also United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999) (noting that pain suffered by prisoner as a result of force used by officer satisfies the injury requirement). In this case, the absence of visible injuries does not mean, therefore, that Plaintiff was not harmed. Thus, the records, standing alone, are not sufficient to permit the Court to conclude as a matter of law that Plaintiff was not subjected to the excessive use of force or that he suffered only de minimis injuries. See Griffin, 193 F.3d at 91 (holding that the Eighth Amendment can be violated "whether or not significant injury is evident"); see also Beckles v. Bennett, No.

05 Civ. 2000(JSR), 2008 WL 821827, *16 (S.D.N.Y. Mar. 26, 2008) (holding that although medical records showed an examination by a nurse found no injuries, the plaintiff's recorded complaints of pain were sufficient to defeat summary judgment).

While a jury may not believe Plaintiff's statements as to the extent of the force used by the officers, or the full extent of the harm Plaintiff claims he suffered, these issues cannot be resolved by the Court as a matter of law. By Defendants' own admission, it took three correction officers using force to take Plaintiff to the floor. Furthermore, with regard to the second alleged assault in the elevator, Defendants admit they escorted Plaintiff to the SHU, but have not denied any of his remaining allegations. Accordingly, the Court recommends that Defendants' motion for summary judgment, with regard to Plaintiff's excessive force claims, be denied.

B. <u>Retaliation</u>

Plaintiff claims that seven correction officers and two supervisors either used force against him, or failed to prevent or stop the assault on him, in retaliation for complaints he filed against Defendant CO Shova. Defendants argue that Plaintiff's claims are baseless, and made without any support.

"[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection

28

between the protected speech and the adverse action.'" <u>Gill v.</u>
<u>Pidlypchak</u>, 389 F.3d 379, 380 (2d Cir. 2004) (quoting <u>Dawes v.</u>
<u>Walker</u>, 239 F.3d 489, 492 (2d Cir. 2001)). "[I]n the prison
context, the Second Circuit has recognized the near inevitability
of decisions and actions by prison officials to which prisoners
will take exception and the ease with which claims of retaliation
may be fabricated. Thus, courts examine prisoners['] claims of
retaliation with skepticism and particular care." <u>Lunney v.</u>
<u>Brureton</u>, No. 04 Civ. 2438 (LAK) (GWG), 2007 WL 1544629, *17
(S.D.N.Y. May 29, 2007) (quoting <u>Colon v. Coughlin</u>, 58 F.3d 865,
872-72 (2d Cir. 1995)) (internal citations and quotation marks
omitted).

Plaintiff has demonstrated that he engaged in protected speech
- he complained about CO Shova. He has also alleged that
corrections officers took adverse action against him by beating him
up, and, as discussed, there are genuine issues of fact with
respect to that allegation. Furthermore, Plaintiff contends that
CO Beers made a specific statement suggesting Plaintiff's
complaints against CO Shova were the reason CO Beers was there and
the reason force was used against Plaintiff. Plaintiff also
contends that CO Shova participated in the assault.[12] Absent any

---

[12] CO Shova has not admitted to using any force against
Plaintiff and denies even being present in his cell. Thus,
Plaintiff must also prove at trial that CO Shova took some
adverse action against him as well.

denial by Defendants, Plaintiff's statements are sufficient to create a genuine issue of material fact as to whether CO Beers and CO Shova retaliated against Plaintiff because he filed grievances about CO Shova.

With respect to Plaintiff's allegation that all of the other correction officers also retaliated against him, there is no evidence of a causal connection between any force used and Plaintiff's complaints. Plaintiff makes only conclusory and speculative allegations with no evidentiary support. Plaintiff does not allege that other Defendants made any statements indicating that their actions were motivated by his complaints about CO Shova, or that they even knew of his complaints about CO Shova.

In the absence of any evidence, other than his own conclusory assertions, the Court recommends that, with regard to any claims that Defendants used excessive force in retaliation for Plaintiff's complaints, summary judgment be granted as to all of the correction officer Defendants except CO Beers and CO Shova.[13]

III. Claims Against Captain Keyser and Sgt. Marinaccio

Plaintiff alleges that Captain Keyser and Sgt. Marinaccio allowed subordinate corrections officers to brutally assault

_____

[13] To the extent that Plaintiff alleges that the medical Defendants also acted in retaliation for his complaints against CO Shova, Plaintiff's speculative and conclusory assertions are similarly insufficient to create any genuine issues of material fact as to causation, and should also be dismissed.

Plaintiff by watching the alleged assault and failing to give an order to stop it. Prison officials may be held liable for their deliberate indifference to violence perpetrated by subordinates. See Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999); see also Farmer v. Brennan, 511 U.S. 825, 828, 114 S. Ct. 1970, 1974 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."). There are two analytical parts to a deliberate indifference claim; first, the objective part requires that a plaintiff show that he faced a "substantial risk of serious harm." Farmer, 511 U.S. at 834, 114 S. Ct. at 1977. Second, the subjective part requires a plaintiff to show that the official "kn[ew] of and disregard[ed] an excessive risk to [the] inmate['s] health or safety." Id., 511 U.S. at 837, 114 S. Ct. at 1979; see also Colon, 58 F.3d at 873 (holding that supervisors are subject to suit if they were "grossly negligent in supervising subordinates who committed the wrongful acts, or . . . exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."). In addition to showing the official acted with deliberate indifference, the inmate must also prove an underlying constitutional violation by the subordinates. See Blyden, 186 F.3d at 265.

Captain Keyser asserts that he should be dismissed from the case because he was not personally involved in the use of force,

and thus did not act with deliberate indifference. This contention is supported by two facts asserted by Keyser: 1) his own statement that he was not involved, and 2) pursuant to a New York regulation, he could not have presided over Plaintiff's disciplinary hearing if he were involved in the underlying incident. Plaintiff asserts, unequivocally, in a sworn statement, that Keyser was present and failed to issue an order to stop an unlawful assault. If true, this assertion is sufficient for a fact finder to conclude that a superior officer was deliberately indifferent to the unconstitutional acts of subordinate officers. See Locicero v. O'Connell, 419 F. Supp. 2d 521, 526 (S.D.N.Y. 2006) (denying summary judgment for a supervisor who allegedly ignored the "repeated malicious acts" of a subordinate.

Keyser's implicit assertion - that the existence of a rule means that it was followed - implicates issues of credibility and the weight to be given to the evidence. These are matters for a fact finder to resolve. In light of two conflicting statements regarding a material fact - Keyser's presence during the incident - the Court must conclude that there are genuine issues of material fact as to whether Keyser acted with deliberate indifference to Plaintiff's safety. Therefore, consistent with the Court's previous conclusion that material facts exist as to whether excessive force was used, the Court concludes that Keyser is not entitled to summary judgment.

As for Sgt. Marinaccio, Plaintiff alleges he was also present when he was assaulted, and failed to prevent officers from assaulting him. At least one report from an officer suggests that Sgt. Marinaccio was present when Plaintiff was handcuffed, and that Sgt. Marinaccio ordered officers to take Plaintiff to the SHU. In light of Plaintiff's allegations and at least one corroborative report, Sgt. Marinaccio, as well, is not entitled to summary judgment.

Accordingly, the Court recommends that summary judgment be denied as to Defendants Keyser and Marinaccio.

IV. <u>Claims Against the Medical Defendants</u>

Plaintiff claims that his complaints of pain and requests for medical treatment went unheeded by three members of the medical staff at the SHU. Defendants argue that Plaintiff has failed to show that any of the medical Defendants were deliberately indifferent to his serious medical needs. The Court agrees.

To assert an Eighth Amendment claim against medical personnel, a plaintiff must come forward with facts demonstrating that each defendant acted with deliberate indifference to his serious medical needs. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1994); <u>see also</u> <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279 (2d Cir. 2006) (noting that while prison officials may not be deliberately indifferent to a prisoner's serious medical needs, "not every lapse in medical care is a constitutional wrong")

33

(citing Farmer v. Brennan, 511 U.S. 825, 832, 844, 114 S. Ct. 1970, 1976 (1994)). There is a two-part inquiry when determining whether a lapse in medical care has risen to the level of a constitutional wrong, one objective, the other subjective. See Salahuddin, 467 F.3d at 279.

Courts conduct an objective analysis to determine whether "the alleged deprivation of adequate medical care was 'sufficiently serious.'" See id. (quoting Farmer, 511 U.S. at 834, 114 S. Ct. at 1977). Determining whether the care a prisoner received was objectively substandard, requires an additional two-part inquiry. See id. First, courts focus on the adequacy of the care. See id. Under this part of the analysis, "'prison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishments Clause.'" Id. at 279-80 (quoting Farmer, 511 U.S. at 845, 114 S. Ct. at 1983). Second, courts focus on the seriousness of a plaintiff's medical needs. Id. at 280. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" Id. (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

The subjective part of the deliberate indifference analysis focuses on whether the charged official acted "with a sufficiently

34

culpable state of mind." Id. (citing Wilson v. Seiter, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)). "In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm." Id. (emphasis added). Rather, the charged official must "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. (citing Farmer 511 U.S. at 836-37, 114 S. Ct. at 1978). Essentially, a defendant must, at a minimum, have a reckless disregard to a serious risk of harm. However, "recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." Id. Thus, "[t]he charged official must be subjectively aware that his conduct creates such a risk," and if a defendant sincerely and honestly believes that his conduct does not create such a risk, "even if objectively unreasonable," he does not posses a sufficiently culpable state of mind. Id. at 281.

Plaintiff claims that Dr. Mamis ignored his requests for medical help (see Pl.'s Opp., at 6 ¶ 18); that Nurse Harlan "was [indifferent] . . . and continued to bark orders . . . [and] removed motrins. . . ." (id. at 5 ¶ 10); and that Nurse Schott refused to treat him and coerced him into signing a Use of Force Report. (See Pl.'s Dep., at 98-100). Each medical Defendant has submitted an affidavit denying Plaintiff's allegations and

35

asserting that Plaintiff was given adequate care. (See Mamis Aff. ¶ 7; Affidavit of Suzanne Harlan, dated Feb. 25, 2008 ("Harlan Aff."), ¶ 3; Affidavit of Stephanie Schott-Mryzglod, dated Feb. 25, 2008 ("Schott Aff."), ¶ 4.) In addition, Defendants have submitted Plaintiff's Health Record. (See Ex. C.) From this evidence, the Court concludes that no reasonable fact finder could conclude that the medical Defendants violated Plaintiff's Eighth Amendment right to medical treatment.

First, Plaintiff has failed to show, under the objective part of the analysis, that he was actually deprived of <u>adequate</u> medical care. There is no evidence that any Defendant acted unreasonably. The medical reports indicate that Plaintiff was seen by medical staff at least twice a day after the incident, that they did not perceive any injuries requiring medical care, and, at times, Plaintiff was uncooperative with the medical staff's attempts at assessing his medical needs.[14] (See Ex. C.) Furthermore, entries signed by other medical staff, not named as defendants here, indicate that, despite Plaintiff's contemporaneous complaints, he did not require additional medical care. (See, e.g., Ex. C, entry dated 6/18/04, signed by J. Bendheim M.D. - "[Plaintiff] & I reviewed entries of 6-16 & 6-17 -04[.] Appears comfortable, seated on bed, writing . . . well adult. . .".)

---

[14] Plaintiff admitted as much in his deposition. (See Pl.'s Dep., at 100-101.)

Second, there is no indication that Plaintiff suffered from a serious medical condition. His health records contain his contemporaneous complaints of pain, but there is nothing indicating that he had injuries requiring immediate treatment. Furthermore, some of his complaints were perceived by medical staff to be inconsistent with his observed activity - such as walking around his cell and talking normally. Moreover, the photographs of Plaintiff, while not particularly detailed, certainly show Plaintiff standing on both feet, with no visible blood, bruising, or swelling. Finally, when seen by a crisis worker at Putnam Hospital, following his suicide attempt only four days after the use-of-force incident, Plaintiff did not report any injuries other than pack pain and a tooth cavity, both of which were pre-existing conditions.

In sum, the documentary evidence does not show that Plaintiff's injuries were objectively serious so as to merit medical attention, or that the medical attention he did receive was somehow inadequate. As for the subjective part of the analysis, the only evidence which might lead to an inference that Defendants knew of, and disregarded, Plaintiff's medical needs are Plaintiff's own contemporaneous complaints to staff, which he claims were ignored. However, Defendants did react to Plaintiff's complaints, and assessed his condition. They either observed no injuries, or were stymied by Plaintiff's uncooperative behavior. In fact, Dr.

Bendheim, who is not a Defendant in this action, met with Plaintiff on June 18th, reviewed his records with Plaintiff, and reported that Plaintiff appeared comfortable and well. (See Ex. C., entry dated 6/18/04.)

Under these circumstances, Defendants cannot be said to have acted negligently, let alone recklessly. At most, on one occasion when Plaintiff claims Nurse Harlan took away Motrins when he requested them, Plaintiff was not given mild pain medications on demand. Therefore, no finder of fact could reasonably conclude that Defendants acted with a sufficiently culpable state of mind, so as to be deliberately indifferent to Plaintiff's serious medical needs. See Brown v. DeFrank, No. 06 Civ. 2235 (AJP), 2006 WL 3313821, at *19-21 (S.D.N.Y. Nov. 15, 2006) (collecting cases, and noting that "disagreement over or delays in treatment do not create a constitutional claim").[15]

The Court therefore recommends that the medical provider Defendants be granted summary judgment.

## CONCLUSION

---

[15] Defendants also assert that they are entitled to qualified immunity. However, because the Court finds that Defendants' conduct did not violate any constitutional right, there is no need to address this issue in detail. See Gilles v. Repicky, 511 F.3d 239, 244 (2d Cir. 2007) ("If the facts . . . do not establish a violation of a constitutional right, 'there is no necessity for further inquiries concerning qualified immunity,' and the officer is entitled to summary judgment.") (quoting Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007)).

For the reasons stated above, this Court recommends: 1) Defendant's Motion for Summary Judgment be granted as to Dr. Mamis, Nurse Harlan and Nurse Schott, and that those Defendants be dismissed from the case; 2) all retaliation claims be dismissed, except as to Defendants CO Beers and CO Shova; 3) summary judgment be denied with regard to Plaintiff's excessive use of force claims against C.O. S. Shova, C.O. J. Beers, C.O. J. Booth, C.O. K. Truesdell, C.O. S. Sarles, C.O. M. Rhynders, C.O. H. Rosario, and C.O. G. Rayburn; and 4) summary judgment be denied as to Plaintiff's deliberate indifference claims against Capt. W. Keyser and Sgt. R. Marinaccio.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Sidney H. Stein, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Stein. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002); Spence v. Superintendent, 219 F.3d 162, 174 (2d Cir. 2000).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:     July 29, 2008
           New York, New York

Copies mailed this date to:

Annang Ninortey
2796 Morris Ave.
Bronx, NY 10468

Office of the Attorney General
Julia Lee, Assistant Attorney General
120 Broadway
New York, NY 10271